UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
TOMMASA VILARDI,

        Plaintiff,

   v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.
-----------------------------------------------------------X
GARAUFIS, United States District Judge.

**NOT FOR PUBLICATION**

<u>MEMORANDUM & ORDER</u>
CV-04-4175 (NGG) (KAM)

Tommasa Vilardi ("Plaintiff") brings this action pursuant to sections 405(g) and 1383(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3). The Plaintiff challenges Commissioner of Social Security Jo Anne B. Barnhart's ("Commissioner" or "Defendant") final determination denying Plaintiff's application for Social Security disability benefits. Specifically, the Plaintiff contends that the Administrative Law Judge ("ALJ") failed to properly apply the "treating physician's rule" and failed to properly evaluate the Plaintiff's credibility. Now before the court are the parties' cross-motions for judgment on the pleadings. For the reasons set forth below, the Defendant's motion is DENIED and the plaintiff's motion is GRANTED to the extent that this case is REMANDED to the Social Security Administration for further proceedings consistent with this opinion.

**I.    Background**

    *A.    Procedural History*

The Plaintiff filed an application for Social Security disability benefits on March 19, 2002, alleging that back injuries, osteoarthritis and osteoporosis prevented her from working

1

after May 31, 2001. (Transcript of the Record ("Tr.") at 57.) The Social Security Administration denied the application on June 18, 2002. (id. at 32.) After a hearing on May 25, 2004 (id. at 19-26), Administrative Law Judge Martin K. Kahn ("the ALJ") determined that the Plaintiff was not eligible for disability benefits. (Id.) This decision became final on August 13, 2004, when the Appeals Council denied the Plaintiff's request for review of the ALJ's decision. (Id. at 4-7.) This action to challenge the Commissioner's final decision was timely filed in accordance with 42 U.S.C. § 405(g).

  B. *The Plaintiff's Personal and Employment History*

  The Plaintiff was born in Italy on September 18, 1941, and came to the United States in August 1955. (Id. at 525-26.) Ms. Vilardi testified that she left high school without graduating after the Eleventh grade and did not attain a GED. (Id. at 526.) She was 62 at the time of the hearing before the ALJ. (Id. at 525.)

  The Plaintiff worked for about forty years at the same bank and performed various different jobs during that period. (Id. at 526-33.) The different positions included switchboard operator, file clerk, bank clerk, account clerk, and bank supervisor. (Id. at 20.) The type of work Plaintiff performed for those positions ranged from light and semi-skilled to sedentary and skilled for the purpose of disability evaluation. (Id.) The Plaintiff's duties in her various positions included filing, writing letters, making appointments and travel arrangements, computer data entry, supervising employees, supervising the pension department, reconciling accounts payable and receivable, answering telephones and processing check replacement and address change requests. (Id. at 534, 537-39.) Her last position involved reconciling accounts in the foreign accounts department, which entailed using a computer and searching paperwork to

ascertain money and bond values. (Id. at 58, 528-30, 534.) The Plaintiff claimed that she was generally sitting, standing and walking approximately three hours each during a workday. (Id. at 58, 530-32.) Following a merger of the bank where she was employed in May 2001, the Plaintiff accepted a severance package and retired. (Id. at 533, 539.)

  C. *The Plaintiff's Medical History*

  Beginning in 1991, the Plaintiff has been afflicted by a host of ailments, some of which persist in causing her pain. The medical conditions troubling the Plaintiff mostly concern her spine, although she also has other ailments, including osteoporosis, osteoarthritis, toxoplasmosis and eye problems.

*1. Spine/Lower Back*

  Back pain was the first symptom that caused the Plaintiff to seek medical treatment. An MRI of her back taken on December 3, 1991 revealed a herniated disc in her lower back. (Id. at 100.) Still suffering from back pain in 1993, the Plaintiff underwent an MRI of her lower back that indicated degeneration of the discs in her spine, but no narrowing of her spine or other evidence of nerve impingement. (Id. at 99.)

  In 1997, another MRI of the Plaintiff's lower back spine revealed disc bulges and osteoarthritis in her lower back. (Id. at 97-98, duplicated at 137-38.) The record reflects that no treatment was prescribed for the Plaintiff's condition.

  The Plaintiff continued to suffer from back pain, which emanated to her right knee and thigh. In 1998, one of the Plaintiff's physicians, Dr. Robert Rozbruch, an orthopedic surgeon, prescribed physical therapy, which failed to improve her condition after eleven sessions. (Id. at 300.)

In November 2000, the Plaintiff visited Dr. David Dickoff, a neurologist, with severe lower back and elbow pain resulting from the use of a stapler. (Id. at 277, duplicated at 330.) Dr. Dickoff observed that she jumped in pain to a light touch the vertebrae in her lower back, but tests indicated that no nerves were damaged or pinched. (Id.) Dr. Dickoff also prescribed the Plaintiff Zoloft for depression and anxiety, as well as an eight-week course of physical therapy. (Id. at 277, 329.) One month later, in December 2000, a CT-scan of the Plaintiff's lower back revealed disc bulges. (Id. at 96, duplicated at 201, 247, 279, 322, 483.) However, there was no evidence of disc herniation, spinal narrowing or pressure on her nerves. (Id. at 96.)

In July 2001, the Plaintiff saw Dr. Dickoff with complaints of aggravated lower back pain that extended to her right thigh, which causing her difficulty climbing stairs, as well as pain in her knee, neck and hand. (Id. at 278, duplicated at 324.) Tests revealed no nerve damage. Dr. Dickoff assessed lower back disc disease and prescribed Vioxx and Nortriptyline. (Id. at 253.) In September 2001, the Plaintiff underwent neurological testing performed by Dr. Dickoff, as a result of which he stated that the findings suggested but did not conclusively establish that her pain was attributable to her lower back. (Id. at 253, 272.) In November 2001, a CT-scan of the Plaintiff's neck revealed two small bony growths in her neck vertebrae that were pinching nerves in her upper spine. (Id. at 84.) In late November 2001, Dr. Dickoff saw the Plaintiff and diagnosed lower back and generalized osteoarthritis. (Id. at 275.)

In March 2002, one of the Plaintiff's joints locked during an examination by Dr. Dickoff, and she had a diminished range of motion in her neck. (Id. at 289.) Dr. Dickoff assessed an inflamed and irritated nerve root in the Plaintiff's neck. (Id.) In May 2002, Dr. Mario Mancheno assessed the Plaintiff's range of motion in her neck and found that X-rays of the Plaintiff's lower

4

back revealed arthritis of the upper and lower spine, and found that she had moderate impairments in lifting, carrying, pushing, pulling, standing and sitting. (Id. at 303-07.) In July 2002, Dr. Dickoff again examined the Plaintiff, diagnosed osteoarthritis of the lower back and prescribed Vioxx. (Id. at 374, 375.) Also in 2002, Dr. Richard Crane assessed generalized osteoarthritis and recommended modification in the Plaintiff's daily living activities to decrease stress on the joints, as well as range of motion exercises and Glucosamine supplements. (Id. at 443.) In October 2003, Dr. Dickoff found the Plaintiff to have diminished range of motion of the neck and assessed neck pain and pain radiating from her lower back and again prescribed Vioxx. (Id. at 371-372.)

### 2. Osteoporosis

In 1997, the Plaintiff was found to have osteoporosis, or low bone density, consistent with her age. (Id. at 93-95, duplicated at 139, 147-148, 356-357.) In 1999, the Plaintiff again exhibited low bone density. (Id. at 88, duplicated at 114, 115, 118-119.) In 2000, Dr. Martin Nydick, an endocrinologist treating the Plaintiff for osteoporosis, informed the Plaintiff that her osteoporosis was worsening and that she should take medication. (Id. at 461.) She was prescribed numerous medications, but was unable to continuously take most of them due to stomach discomfort. (Id. at 101, 222, 465, 472.) In 2001 and 2002, the Plaintiff's osteoporosis was advancing, (id. at 206-207) despite undergoing drug therapy since 2000. (Id. at 204.)

In late November 2001, Dr. Nydick submitted in a response to a questionnaire to the New York State Office of Temporary Disability Assistance. The form is unsigned and incomplete. In response to the question of whether the Plaintiff displayed any behavior suggestive of a significant psychiatric disorder, he wrote that she "[s]eems very neurotic." (Id. at 102.) Dr.

5

Nydick answered "[n]one" in response to a question about the Plaintiff's past symptoms and treatment history. (Id.) Additionally, Dr. Nydick checked off boxes on the questionnaire that indicated the Plaintiff had no limitations of range of motion and wrote that she was capable of lifting 20 pounds. (Id. at 105.) The questionnaire form stated that Vilardi was "[c]apable (physically) of work." (Id. at 103, duplicated at 104.)

### 3. Toxoplasmosis

In 2001, the Plaintiff was diagnosed with toxoplasmosis, a disease caused by a parasite, which normally results in flu-like symptoms. (Id. at 219.) Dr. Kenneth Roistacher characterized the illness as an acute case with minimal symptoms that did not require treatment. (Id. at 244, 257, duplicated at 428.) The Plaintiff testified at her hearing that the Toxoplasmosis made her feel weak during the day and slowed her movement. (Id. at 553.)

### 4. Eyes

On May 28, 2003, the Plaintiff sought treatment for eye flashes and was diagnosed with posterior vitreous detachment (separation of eye fluid from the retina) in the left eye. (Id. at 370.) Days later the Plaintiff sought treatment with Dr. Raj Modi complaining of "floaters" and was diagnosed with posterior vitreous detachment in the left eye and early cataracts. (Id. at 417.) At the disability hearing the Plaintiff experienced difficulty with glare in the room and had to wear sunglasses. (Id. at 527-528.)

D. *Non-Medical Evidence*

The Plaintiff testified about her functional limitations and pain at her disability hearing. At the outset of the hearing, the Plaintiff's eye problems were an issue as she was looking down to avoid light coming in through the window so that her answers were inaudible. (Id.) The

Plaintiff also stated that she hires a cleaner to perform anything beyond light cleaning in her house, and that her brother, who lives next door to her, does her grocery shopping. (Id. at 556.) In a Social Security form, the Plaintiff stated that she neglected to inform her employer of her medical problems and that she did "not pick up or lift anything heavy - [she] would ask someone to do it for [her]." (Id. at 57.) The Plaintiff testified that she can only walk short distances (id. at 552), and that it takes her approximately two to three hours to be able to move around in the morning. (Id. at 556.) The Plaintiff testified that during a typical day she passes the time either watching television or performing exercises to obtain relief from her back pain. (Id.)

## II. Discussion

### A. Standard of Review

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error. 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). A reviewing court should verify that a claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 43 (2d Cir. 1972)).

A full hearing includes a well-developed medical record. Because of the non-adversarial nature of a benefits hearing, where the record is incomplete, an ALJ has an affirmative duty "to develop a claimant's medical history even when the claimant is represented by counsel . . . ." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). Further, in evaluating medical evidence, an ALJ must give good reasons for the weight the ALJ assigns to the opinions of a claimant's treating source. 20 C.F.R. § 404.1527(d)(2); see

Rosa, 168 F.3d at 79 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).  Upon a conclusion that an ALJ fails to properly develop the record, a district court may remand the administrative decision for further fact finding by the ALJ.  Rosa, 168 F.3d at 82-83.

    B.    *The ALJ's Decision*

To receive benefits, a claimant must be "disabled" within the meaning of the Social Security Act.  Shaw, 221 F.3d at 131.  Agency rules require the Commissioner to apply a five-step sequential analysis to evaluate whether claimant is disabled.  See 20 C.F.R. § 404.1520.

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw, 221 F.3d at 132 (citing DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998)).  The ALJ acknowledged this five-step analytical framework in his decision.  (Tr. at 20.)  He found that the Plaintiff met the disability requirements of the first two steps because she was not

8

engaged in gainful activity (id. at 20) and because the Plaintiff's impairments were "severe within the meaning of Social Security regulations." (Id. at 24.) However, the ALJ further found that the Plaintiff's impairments were "not attended by medical findings that meet or equal the requirements of any listed impairment found in the Listed Impairments located at Appendix 1, subpart p, Regulations No. 4." (Id.)

The ALJ found that the Plaintiff's disability claim failed at the fourth step because, despite her severe impairment, she retained sufficient residual functional capacity to return to her past work. (Id. at 24.) The ALJ determined that the Plaintiff's residual functional capacity allowed her to "sit, stand and walk for up to 6 hours per day, and lift and carry as much as 20 pounds." (Id.) This assessment was "based on the objective medical record, which includes the assessment of Dr.'s Nydick and Mancheno, who found that the claimant had no neurological abnormalities; [and] Dr. Dickoff, who found that the claimant had no neurological abnormalities . . . ." (Id.) The ALJ also based his conclusion on the testimony of a vocational expert that the Plaintiff could continue to perform the duties of her prior positions at the bank. (Id.) In accordance with the five-step analysis, the ALJ found that because the Plaintiff retained sufficient capacity to continue her old work, she was not disabled within the meaning of the Social Security Act and thus not entitled to benefits. (Id. at 25).

The ALJ also took "into account the opinion of the claimant's personal physician concerning the issue of disability." (Id. at 24.) The ALJ found the opinion of Dr. Nydick that the claimant was physically able to work to be consistent with objective medical evidence and not contradicted by any other of the Plaintiff's physicians' opinions. (Id.) The ALJ also took into account "the claimant's assertions, statements, and hearing testimony concerning her symptoms

9

and functional limitations." (Id. at 25.) The ALJ found that the Plaintiff's claims of pain and limitations were disproportionate to the clinical findings and not supported by the medical evidence. (Id.) Particularly, the ALJ noted that the Plaintiff's neurological tests, range of motion and lack of hospitalization contradicted her claims, and that she was able to care for herself and was sufficiently mobile to get around her neighborhood. (Id.) The ALJ also attributed the majority of the Plaintiff's problems to her inability to tolerate pain medication. (Id.) The ALJ concluded that the Plaintiff was "not entirely credible." (Id.)

    C.    *The Plaintiff's Claims*

    1.    *The Treating Physician Rule*

The Plaintiff in support of her motion argues that the ALJ failed to properly apply the "treating physician's rule" because he did not develop the record by pursuing further evaluations from Drs. Dickoff and Crane. (Pl. Mem. Supp. Mot. J., at 14.) The Plaintiff urges that such inquiries were necessary because they would have "allowed the ALJ to adequately determine the appropriate weight to give their opinions." (Id.) The government contends that the ALJ properly concluded that the Plaintiff was physically able to work because Dr. Nydick's opinion as to her ability "was well-supported by his own clinical examination findings and consistent with the other substantial evidence in the record." (Def. Mem. Supp. Mot. J., at 21.)

"The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." Rosa, 168 F.3d at 78-79; 20 C.F.R. § 404.1527(d)(2). An ALJ is required to provide "good reasons" to accord the opinion other than controlling weight. See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. § 416.927(d)(2). Specifically, an ALJ must apply the factors set out in 20 C.F.R. §

10

404.1527(d)(2)-(6), including:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32. A court will not "hesitate to remand when the Commissioner . . . do[es] not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33. Further, before rejecting a treating physician's diagnosis, an ALJ must first "attempt[] to fill any clear gaps in the administrative record." Rosa, 168 F.3d at 79. Thus, the ALJ has an affirmative duty to develop the administrative record. See id.; Perez, 77 F.3d at 47.

Pursuant to 20 C.F.R. § 404.1512(e), an ALJ is required to contact a "treating physician . . . . or other medical source . . . . [to seek additional evidence or clarification where the medical evidence] contains a conflict or ambiguity that must be resolved . . . . [or the] report[s] do[] not contain all the necessary information . . . ." Such inquiries "are particularly important as Social Security proceedings are inquisitorial rather than adversarial," and the ALJ has a corresponding "duty to investigate the facts and develop the arguments for and against granting benefits . . . ." Sims v. Apfel, 530 U.S. 103, 110-111 (2000).

The Plaintiff argues that the ALJ erred in finding "that the Plaintiff's treating physicians' opinions were not based on sufficient evidence . . . ." (Pl. Mem. Supp. Mot. J., at 15.) However, the ALJ did not discount any of the Plaintiff's treating physicians' opinions. Rather, he credited the opinion of Dr. Nydick that the Plaintiff was physically able to work because he found it to be "consistent with the objective medical evidence." (Tr. at 25.) Indeed, Dr. Nydick was the only physician who came to an assessment regarding the Plaintiff's ability to work. The Plaintiff's

11

other physicians do not specifically state whether the Plaintiff is physically capable of working. The question facing this Court, therefore, is whether Dr. Nydick's opinion upon which the ALJ relied to conclude that the Plaintiff is able to work is supported by substantial evidence.

Upon a review of the medical evidence, I find that the ALJ's opinion is not supported by substantial evidence. The ALJ erred in affording Dr. Nydick's opinion conclusive weight because it ignores the medical information in the record and fails to ascertain the opinions of physicians who had more fully examined the Plaintiff over a longer period of time. The Plaintiff, over an approximately ten year period, had more than six examining physicians, who have examined, diagnosed and treated her for osteoarthritis, osteoporosis, toxoplasmosis, and eye conditions. In particular, the Plaintiff saw Dr. Dickoff since 2002 and Dr. Collette Spaccavento since the 1990's regarding her back problems arising from osteoarthritis and other conditions outside of Dr. Nydick's specialty, but there is nothing in the record regarding their assessments of the Plaintiff's ability to work. The Plaintiff saw other physicians and their assessments of her condition continued to change up until at least 2003, well after Dr. Nydick filled out the questionnaire in 2001. (Id. at 101.) Some of the Plaintiff's other treating physicians were given disability questionnaires to fill out and left them blank. (Id. at 266-70, 281-87.) Others were not provided with disability questionnaires and had no opportunity to assess her physical ability to work. In light of the sheer volume of medical evidence the Plaintiff's various physicians produced, and the fact that only one of them ever commented on her ability to work, the ALJ had a duty to contact the other physicians for their opinions on the issue of disability.

The ALJ placed undue weight on Dr. Nydick's questionnaire in so far as he found that five words in a disability questionnaire constitutes a medical opinion of the Plaintiff's current

ability to work. (Id. at 25.) Dr. Nydick's response that the Plaintiff had no previous treatment or symptoms seems to suggest that Dr. Nydick was unaware that the Plaintiff was at the time undergoing treatment by Dr. Dickoff for osteoarthritis, or that she had been complaining of lower back pain for the prior ten years. Moreover, Dr. Nydick gave his opinion as to the Plaintiff's ability to work based on his examinations up until 2001. (Id. at 101.) Furthermore, as stated above, other physicians who had seen the Plaintiff at later dates than Dr. Nydick are clearly in a better position to render an opinion regarding her present physical ability to work, as opposed to her ability in 2001.

Also, in deciding to give Dr. Nydick's evaluation great weight, the ALJ made no mention of the impact that Dr. Nydick's expertise and specialization played in the decision-making process. The ALJ, however, was required to consider this factor under the regulations. See 20 C.F.R. § 416.927(d)(2)(iv).

In conclusion, I find that there is insufficient evidence supporting the controlling weight that the ALJ afforded Dr. Nydick's conclusion that the Plaintiff is able to work. See Rosa v. Callahan, 168 F.3d at 72, 83 (physicians' silence on the issue of disability could not be interpreted to indicate that they intended to set forth an opinion on the claimant's ability to work and remanded the case for further findings that would help assure a proper disposition); see also Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). On remand, the ALJ should not only contact the Plaintiff's other treating physicians for their opinions with regard to her ability to work, he should also provide clearer reasons for affording Dr. Nydick's opinion the assigned weight. If any relevant facts are unknown, the ALJ should investigate these facts and present them in his decision in accordance with his obligation to develop the record. 20 C.F.R. § 1512(d), (e).

## 2. The Plaintiff's Credibility

Second, the Plaintiff urges that this Court remand the decision for a proper evaluation of her credibility with regard to her subjective complaints of pain. The ALJ concluded that the Plaintiff was "not entirely credible." (Tr. at 25.) In reaching that conclusion the ALJ reasoned that the Plaintiff's claims of pain and functional limitation were inconsistent with medical findings. (Id. at 25.) Particularly, the ALJ found that there was no nerve root or spinal cord damage reflected in her medical examinations and that she exhibited a good range of motion in her hands and lower extremity joints. (Id.) The ALJ also found significant that the Plaintiff had been treated conservatively and was never hospitalized. (Id.) Finally, the ALJ ruled that the Plaintiff was able to use public transportation and perform activities necessary to care for herself, demonstrating an ability to perform routine tasks associated with her prior work. (Id.)

"It is the function of the Commissioner, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health and Human Servs., 728 F.2d 588, 591 (2d Cir.1984) (alteration in original) (quotation omitted). However, a court must review the decision of the ALJ to assure that the ALJ's determination of credibility comports with the standards set by the Social Security Administration and the law of this circuit. The regulations require an ALJ to evaluate a plaintiff's report of her symptoms through a two-step analysis. First, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment[ ]--i.e., an impairment[ ] that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or

other symptoms." Social Security Ruling, 1996 WL 374186, at *2; see also 20 C.F.R. § 416.929(b). Second, "once an underlying physical or mental impairment[ ] that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id. Such an evaluation must include consideration of the credibility of the plaintiff's subjective reports of pain, which in turn requires that the ALJ "must consider" the following non-exclusive list of factors:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms

Id. at *2-3. In reaching a determination regarding a plaintiff's credibility, an ALJ is also obligated to consider relevant statements from treating and consulting physicians and any observations noted by SSA employees during interviews. Id. at *5. Additionally, a "claimant with a good work record is entitled to substantial credibility when claiming inability to work

because of disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983).

The ALJ applied some of the factors set forth in the Social Security Ruling 96-7p in his decision, however, he failed to consider some of the facts and did not conduct a complete analysis. The ALJ concluded that because there was no neurological damage and the Plaintiff had a good range of motion, her claims of pain were disproportionate to and not supported by the medical evidence on record. (Tr. at 24.) The ALJ, however, did not specifically address whether the Plaintiff's osteoarthritis "could reasonably be expected to produce" such "pain or other symptoms," which is the analysis demanded under the regulations. See 1996 WL 374186, at *2. Having found that the Plaintiff's physicians diagnosed her as having osteoarthritis with "mild to moderate functional limitations" (Tr. at 23), the ALJ was obliged to consider whether these impairments, not separate symptoms, could cause the pain the Plaintiff contends she experiences.

In the second step of the analysis, the ALJ's evaluation of the Plaintiff's subjective complaints of pain both overlooked significant facts in the record and failed to properly take into account relevant factors from the regulations.

The ALJ's credibility determination appears not to have credited the Plaintiff's testimony concerning her daily activities. The activities on which the ALJ based his conclusion were that the Plaintiff "maintains her household without assistance, performing such activities as shopping, cooking, washing and cleaning. She also uses public transportation, takes daily walks, attends religious services, and socializes with friends and family." (Id.) However, the ALJ's conclusion that the Plaintiff "maintains her household without assistance . . ." is belied by the Plaintiff's testimony that she hires a cleaner to perform anything beyond light cleaning in her house, and

16

that her brother, who lives next door to her, does her grocery shopping. (Id. at 556.) There is no testimony or any other evidence in the record to indicate that she "takes daily walks," as the ALJ found in his opinion. (Id. at 25.) The Plaintiff indicated that she can only walk for about three or four blocks (id. at 552), and that it takes her approximately two to three hours to be able to move around in the morning. (Id. at 556.) The Plaintiff testified that during a typical day she passes the time by "[e]ither watching TV [or] do[ing] a lot of exercise . . . for [her] back . . ." (Id.) Thus, the full record reveals substantial limitations to the Plaintiff's physical capabilities unaccounted for in the ALJ's conclusions. In finding that the Plaintiff's daily activities demonstrate that she is not disabled, the ALJ seems to have focused only on the type of activities that she testified she engaged in, rather than the manner in which she engages in them. However, "[t]he Second Circuit has frequently rejected determinations that a person is not disabled based on minimal activities of daily life not engaged in 'for sustained periods comparable to those required to hold a sedentary job.'" Sarchese v. Barnhart, No. 01 Civ. 2172, 2002 WL 1732802, at *8 (E.D.N.Y. July 19, 2002) (Gleeson, J.) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643 (2d Cir.1983)) In light of the Plaintiff's testimony of the limitations that her medical conditions impose on her daily life, the ALJ's conclusion that she "engages in a range of daily living activities that contradict her description of her functional capacity," (Tr. at 25.) is not supported by substantial evidence.

Finally, the ALJ failed to take into account two factors that bolster the Plaintiff's credibility. The first is the Plaintiff's long and uninterrupted work history of almost 40 years at the same bank. There is evidence in the record that the Plaintiff actually concealed her pain and disability from her employers, indicating that she valued her job enough to continue working

17

despite her discomfort. In a Social Security form filled out by the Plaintiff she states, "I did not make the employer aware of these problems - I would not pick up or lift anything heavy - I would ask someone to do it for me." (Id. at 57.) Second, while all of the Plaintiff's doctors seem to agree that her reports of subjective pain is unusual for her symptoms, she had been making disproportionate claims of pain since 1990. Thus, the Plaintiff was afflicted with disproportionate pain almost a decade prior to any motive she may currently have to exaggerate. The ALJ's conclusion that she exaggerated her pain to bolster her Social Security claim is not supported by substantial evidence. The fact that she has been experiencing a great deal of pain for such a long period of time seems to suggest that she has a low threshold for pain.

On remand the ALJ should apply Social Security Ruling 96-7p meaningfully. First, the ALJ should address whether the Plaintiff's medical impairment reasonably might be expected to give rise to the type of pain of which she complains. Second, the ALJ should make a full examination of the Plaintiff's explanations regarding her ability to carry out daily activities and should also address other relevant factors provided in the regulations concerning the Plaintiff's credibility.

## III. Conclusion

For the foregoing reasons, the Commissioner's motion is DENIED and the Plaintiff's motion is GRANTED to the extent that this case is REMANDED to the Social Security Administration for further proceedings consistent with this opinion.

SO ORDERED.

Dated: March __, 2006  /s/ Nicholas Garaufis
     Brooklyn, NY  NICHOLAS G. GARAUFIS
                                                                    United States District Judge